# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                )
KIM L. CARTER,                  )
                                )
                Plaintiff,      )
                                )
        v.                      )          Civil Action No. 17-1752 (ABJ)
                                )
JAMES F. BRIDENSTINE,           )
Administrator,                  )
National Aeronautics            )
and Space Administration,       )
                                )
                Defendant.      )
_____)

## <u>MEMORANDUM OPINION</u>

Plaintiff Kim L. Carter brought this lawsuit under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, against the Administrator of the National Aeronautics and Space Administration ("NASA"), James F. Bridenstine, alleging that NASA unlawfully denied her reasonable accommodations for her disability, discriminated and retaliated against her due to her participation in protected activities and membership in protected classes, and exposed her to a hostile work environment. She also contends that due to the intolerable environment created by those unlawful acts, she was constructively discharged from her job. Compl. [Dkt. # 1].

Pending before the Court is defendant's motion for summary judgment. Def.'s Mot. for Summ. J. [Dkt. # 14] ("Def.'s Mot."). He argues that plaintiff has failed to show she was denied a reasonable accommodation, that she has not come forward with evidence of discrimination or retaliation, and that she has not shown that her working conditions were objectively hostile such

that she was constructively discharged.  *See generally* Mem. in Supp. of Def.'s Mot. for Summ. J. [Dkt. # 14] ("Def.'s Mem.").

While plaintiff had the right to expect that she could be supervised without being yelled at, and there is no question that she suffered from serious medical conditions exacerbated by stress, there are no genuine disputes with respect to any material fact at issue, and the defendant is entitled to judgment as a matter of law.

## BACKGROUND

The parties have submitted extensive briefing and a large number of exhibits in this case. To understand the context of the instant matter, it is necessary to review the history of plaintiff's protected activities at NASA.  Except where noted, the following facts are not in dispute.

### I.      Plaintiff's Employment History

Plaintiff worked for NASA at its headquarters in Washington, D.C. until her retirement on March 3, 2017.  Def.'s SOF [Dkt. # 14] ¶ 1; Pl.'s SOF [Dkt. # 18-1] ¶ 1.  Plaintiff is an African American woman.  Def.'s SOF ¶ 3; Pl.'s SOF ¶ 3.  In 2014, she was a Program Specialist in the Office of International and Interagency Relations ("OIIR") and was at a GS-12 pay grade.  Def.'s SOF ¶ 4; Pl.'s SOF ¶ 4.  From 2009 until 2017, DeVon Fleming[1], an African American woman, and Albert Condes served as plaintiff's first and second level supervisors respectively.  Def.'s SOF ¶¶ 2, 3; Pl.'s SOF ¶¶ 2, 3.

### II.     January 2015 Desk Audit

In January 2015, plaintiff requested that her employer undertake a "desk audit."  Def.'s SOF ¶ 6; Pl.'s SOF ¶ 6.  A desk audit is conducted by a federal agency to determine if the duties

---

1      The spelling of Fleming's first name varies throughout the pleadings and exhibits presented in this case.  Where text has been quoted directly, the spelling of her name (as either Devon or DeVon) has been copied exactly.

and responsibilities in the position description for a certain job within the agency comport with the activities actually being carried out by the employee holding that job. Def.'s SOF ¶ 7; Pl.'s SOF ¶ 7. This leads to a determination of whether the pay grade level assigned to the employee is an accurate reflection of the work she is performing. *Id.* Plaintiff's desk audit resulted in a determination that she was performing at a GS-9 level and not a GS-12 level. Def.'s SOF ¶ 8; Pl.'s SOF ¶ 8. Plaintiff disputes the results of the desk audit, and she maintains that she was performing work at a level of GS-12 or higher. Pl.'s SOF ¶¶ 8–9.

Following the desk audit, Fleming, as plaintiff's supervisor, was required to choose between downgrading plaintiff to a GS-9 level or assigning her new tasks to meet the GS-12 position description. Def.'s SOF ¶ 9; Pl.'s SOF ¶ 9. Fleming chose to keep plaintiff at the GS-12 level by making sure she was performing assignments that met the GS-12 criteria and by creating a new position description for the job. Def.'s SOF ¶¶ 9–10; Pl.'s SOF ¶¶ 9–10. Plaintiff contends that the new position description did not accurately reflect the work she had been performing. Pl.'s SOF ¶ 10. After receiving the desk audit results, plaintiff filed an appeal with the Office of Personnel Management ("OPM"), which was still open at the time of her retirement. Def.'s SOF ¶¶ 11–12; Pl.'s SOF ¶¶ 11–12.

### III. Plaintiff's 2015 Harassment Allegations and Investigation

On October 21, 2015, plaintiff completed an anti-harassment questionnaire and submitted it to NASA, naming Fleming, Condes, and Michael F. O'Brien as alleged harassers.[2] Def.'s SOF ¶ 16; Pl.'s SOF ¶ 16; Ex. 9 to Pl.'s Opp. [Dkt. # 18-11] ("Questionnaire"). NASA's anti-harassment policy, which is separate from its Equal Employment Opportunity ("EEO") process, "involves a set of procedures that seeks to investigate and resolve potential harassment in the

---

2      It is unclear from the record what role Michael F. O'Brien held at NASA.

workplace before it becomes severe and pervasive." Def.'s SOF ¶¶ 17–18; Pl.'s SOF ¶¶ 17–18.

Although plaintiff alleged several instances of discrimination and harassment by her supervisors, a Human Resources Specialist, Tiffany Schuffert, tasked with responding to the questionnaire in conjunction with NASA's Office of General Counsel, found that only two allegations could properly be investigated under NASA's policy. Decl. of Tiffany Schuffert, Ex. 4 to Def.'s Mot. [Dkt. # 14-4] ("Schuffert Decl.") at ¶¶ 1, 13–17. The two instances, alleging "loud yelling" by Fleming, took place in March 2015 and May 2015. *Id.* ¶ 17.[3] Plaintiff maintains that the decision regarding her questionnaire "ignored substantial evidence of endemic bullying and harassment by [p]laintiff's immediate supervisor, Ms. Devon Fleming and her second-level supervisor, Mr. Albert Condes." Pl.'s SOF ¶ 19.

NASA's Anti-Harassment Policy states in sections 1.2.3, 1.2.3.4., and 1.2.3.5. that "[i]n responding to specific allegations of harassing conduct, supervisors and managers shall: . . . [a]ct as . . . Fact Finder to conduct fact-findings into allegations of harassment where fact-finding is necessary . . . [and t]ake appropriate corrective action . . . as necessary after consultation and notification of appropriate officials." Ex. 1 to Schuffert Decl. [Dkt. # 14-4] ("Anti-Harassment Procedures") at 10–11. The procedures also state at Section 1.2.5 that, "[t]he management official shall normally be the next higher level supervisor or manager in the chain of command. . . ." *Id.* at 11. Based on these policies, and after discussion with the Office of General Counsel, Schuffert

---

3      It is unclear from the timeline provided by plaintiff in the anti-harassment questionnaire which incidents of yelling were the two Schuffert acknowledged in her declaration. There is one clear reference to the "negative loud yelling situation" on March 29, 2015, but plaintiff also states in her questionnaire that "I have been in DeVon Fleming office, and numerous occasions where she has tried to create negative loud yelling situation when I was in her office." Questionnaire at 9. The EEO complaint filed on April 5, 2016, plaintiff identifies two precise dates of alleged yelling by Fleming: March 29, 2015 and May 3, 2015. *See* Ex. 19 to Pl.'s Opp. [Dkt. # 18-21] at 1. That information, however, is not included in the anti-harassment questionnaire.

designated Condes – plaintiff's second-level supervisor and Fleming's immediate supervisor – to investigate the allegations. Schuffert Decl. ¶ 18. Plaintiff claims that it was improper for Condes to investigate "his own conduct in violation of the anti-harassment policy . . . ." Pl.'s SOF ¶ 20.

As part of his investigation, Condes attempted to meet with plaintiff, and she initially refused. Def.'s SOF ¶ 21; Pl.'s SOF ¶ 21. Condes sent an email to plaintiff stating "I would very much like to ask you to reconsider speaking with me . . . . You are not obligated to attend [a meeting], but it will make it difficult for me to address your concerns if I can't hear your perspective." Def.'s SOF ¶ 21; Pl.'s SOF ¶ 21. Over the course of the investigation, Condes ultimately interviewed plaintiff, as well as Fleming and at least one other individual. Schuffert Decl. ¶ 19. Condes concluded there had not been a violation of the Anti-Harassment Policy, and the matter was closed. *Id*. ¶ 21.[4]

## IV. Plaintiff's October 2015 Request for Accommodation

Plaintiff submitted a request for reasonable accommodation form to NASA on October 23, 2015. Def's SOF ¶ 32; Pl.'s SOF ¶ 32; Ex. 15 to Pl.'s Opp. [Dkt. # 18-17] ("Request 1"). In it, she stated that "[d]ue to the hostile and toxic work environment in the Office of International and Interagency Relations (OIIR), I respectfully request to be transfered [sic] to another office. Until my request is granted, I would like either to telework from home and or be put on paid administrative leave." Request 1 at 1. Plaintiff later confirmed with Fleming that that she was

---

4       Plaintiff later explained in her April 2016 EEO complaint, discussed in *infra* section VII and in her deposition, that the two incidents of yelling on March 29, 2015 and May 3, 2015 were the ones "that really bothered [her] the most," and "the two that [she] will stand by." Def's SOF ¶ 27; Pl.'s SOF ¶ 27; Ex. 5 to Def.'s Mot. [Dkt. # 14-5] ("Carter Dep.") at 105:3–4, 19–20. She also stated that the two incidents were not "the only time that [Fleming] yelled at [her] or got rude with [her] or obnoxious with [her]." Carter Dep. at 105:6–8.

asking to telework one-to-two days per week, likely Monday and/or Friday as the accommodation. Def.'s SOF ¶ 34; Pl.'s SOF ¶ 34.

In the request, plaintiff stated that her medical conditions included hypertension and complex migraines, among other ailments.  Request 1 at 1.  The physical manifestations of her condition, however, would arise episodically and not predictably.  Def.'s SOF. ¶ 35; Pl.'s SOF ¶ 35.  Indeed, in a November 23, 2015 letter, a Department of Health & Human Services ("DOH") doctor, Papiya Ray, wrote that "although [plaintiff's] condition is chronic, the symptoms it causes wax and wane.  Therefore, any resultant limitations may be intermittently present. . . ."  Letter from Doctor Papiya Ray, Ex. 18 to Pl.'s Opp. [Dkt. # 18-20] ("2015 Ray Letter") at 2.

NASA's reasonable accommodation policy treats reassignment as "a last resort" and clarifies that a "reassignment will only be considered if no reasonable accommodations are effective to enable the employee to perform the essential functions of the current job[.]"  Ex. 11 to Pl.'s Opp.  [Dkt. # 18-13] ("Accom. Policy") §§ 3.4.4g, 3.4.5.  Fleming ultimately determined that

the appropriate accommodation for plaintiff would be to continue episodic telework as needed. Def.'s SOF ¶¶ 36–37; Pl.s SOF ¶¶ 36–37.[5]

## V.     Plaintiff's November 2015 Mid-Point Review

On November 26, 2015, plaintiff emailed Fleming that she had not yet received the mid-point review that was due on November 30th.  Def.'s SOF ¶ 22; Pl.'s SOF ¶ 22.  Fleming held the review on November 30th, during which she asked plaintiff to certify OIIR travel – a duty that fell within plaintiff's position description.  Def.'s SOF ¶¶ 23–25; Pl.'s SOF ¶ 23–25.

## VI.    January 2016 Letter of Counseling

On January 5, 2016, Fleming issued plaintiff a counseling letter that listed at least twelve performance errors plaintiff had made in 2015 related to a critical element of her performance

---

5       In her Statement of Facts, plaintiff asserts that she, "disputes that she was afforded the opportunity to take periodic telework as an accommodation since Ms. Fleming routinely denied Plaintiff's requests to telework due to her medical conditions."  Pl.'s SOF ¶ 37.  She cites to paragraph nineteen of her declaration, Ex. 1 to Pl.'s Opp. [Dkt. # 18-3] ("Carter Decl."), which states, "[e]pisodic telework was not granted to me by Ms. Fleming between January 2016 and March 2017."  However, in her May 3, 2018 deposition, when asked if she could remember any instances when Fleming denied a request to telework, plaintiff testified that "after 2015, she approved it."  Carter Dep. at 45:17.

The D.C. Circuit has repeatedly held that it, like "[v]irtually every circuit[,]" has "a form of the so-called 'sham affidavit rule,' which precludes a party from creating an issue of material fact by contradicting prior sworn testimony unless the 'shifting party can offer persuasive reasons for believing the supposed correction' is more accurate than the prior testimony."  *Galvin v. Eli Lilly and Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007).  "A party can also support repudiation of an earlier statement by offering newly discovered evidence."  *Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991).

In this case, plaintiff has failed to supply any grounds for why the Court should accept her declaration over her previously sworn deposition testimony.  And, other evidence provided by plaintiff contradicts her statement in the declaration.  *See, e.g.*, Ex. 38 to Pl.'s Opp. [Dkt. # 18-40] at 3 (email from Fleming to plaintiff summarizing a tag-up meeting that stated, "You will telework for 4 hours on Fri 12/23[/]2016"); Ex. 41 to Pl.'s Opp. [Dkt. # 18-43] ("PIP Notice") at 3 ("On July 1, 2016 . . . [plaintiff] was teleworking. . . .").  For these reasons, there is no genuine dispute as to the fact that plaintiff was granted episodic telework as needed.

plan.[6]  Def.'s SOF ¶ 29; Pl.'s SOF ¶ 29; Ex. 3 to Decl. of DeVon Fleming ("Fleming Decl."), Ex. 2 to Def.'s Mot. [Dkt. # 14-2] ("Counseling Letter") at 1–2.  In the letter, Fleming also stated "[w]e have talked about your performance on a number of occasions during our weekly tag ups and I have seen little improvement."  Counseling Letter at 1.  The letter included a set of performance expectations.  *Id*. at 2.

The counseling letter did not become part of plaintiff's personnel file, and she was given a "fully successful" performance rating for the 2015–2016 performance period by Fleming.  Def.'s SOF ¶¶ 30–31; Pl.'s SOF ¶¶ 30-31.  Fleming noted in the letter, though, that "[d]uring this rating cycle, I worked closely with Ms. Carter to assist in improving the quality of her overall work performance.  In spite of that, it has not had an impact on her performance and she is not performing with the level of detail and understanding required for this position."  Ex. 4 to Fleming Decl. [Dkt. # 14-2] at 7.

## VII.  Plaintiff's April 2016 EEO Complaint

On December 21, 2015, plaintiff contacted an EEO counselor and received counseling.  Def.'s SOF ¶ 13; Pl.'s SOF ¶ 13; *see also* Ex. 1 to Decl. of Kathleen Teale ("Teale Decl."), Ex. 3 to Def.'s Mot. [Dkt. # 14-3] ("April 2016 EEO Compl.") at 1–2.  On April 5, 2016, plaintiff filed a formal EEO complaint, alleging discrimination and/or retaliation by Fleming and Condes and a hostile work environment.  Def.'s SOF ¶¶ 13–15; Pl.'s SOF ¶¶ 13–15.  The complaint alleged the following six acts of discrimination and retaliation:

1) Fleming added additional duties to plaintiff's position description without explanation;

2) Fleming yelled at plaintiff on two occasions – March 29, 2015 and May 3, 2015;

---

6      Plaintiff does not dispute that the letter was issued, but denies that her work was deficient.  Pl.'s SOF ¶ 29.

3) Plaintiff had to contact Fleming for her mid-point evaluation on November 30, 2015 because Fleming had not reached out to plaintiff;

4) On January 5, 2016, Fleming issued a counseling letter to plaintiff based on her poor performance;

5) Plaintiff was harassed by Condes, in his role as investigator of plaintiff's harassment complaint, including through a January 7, 2016 email invitation from Condes asking to discuss the behavior alleged in plaintiff's questionnaire;

6) Fleming denied plaintiff's request for accommodation on January 5, 2016.

Def.'s SOF ¶ 14; Pl.'s SOF ¶ 14; *see* April 2016 EEO Compl. at 1–2.

On August 12, 2016, plaintiff submitted an amendment to the April 2016 EEO complaint, adding that Fleming had failed to meet with her prior to issuing her June 30, 2016 Performance Rating.[7] Def.'s SOF ¶ 38; Pl.'s SOF ¶ 38. The two met on June 30, 2016 to discuss the review, and plaintiff emailed Fleming afterwards stating that she would "need a couple of days to review and respond to the summary in [her] performance review and rating. . . ." Ex. 6 to Teale Decl. [Dkt. # 14-3] at 1. On July 5, 2016, plaintiff emailed Fleming again stating, "I need to speak with my Lawyer first, before I sign off on my performance review which will be in a few days." Ex. 6 to Teale Decl. at 1; Def.'s SOF ¶¶ 39–41; Pl.'s SOF ¶¶ 39–41. Plaintiff never signed off on the performance rating, which evaluated her as "fully successful." Def.'s SOF ¶ 42; Pl.'s SOF ¶ 42.

**VIII. Plaintiff's Second Request for Accommodation**

On November 7, 2016, plaintiff submitted a new request for a reasonable accommodation. *See* Ex. 13 to Teale Decl. [Dkt. # 14-3] ("Request 2"); Def.'s SOF ¶ 60; Pl.'s SOF ¶ 60. In it, she stated that "[o]ver the last several months, I have initiated both discrimination and retaliation

---

7    The amended EEO complaint also contains a section on the 2017 Performance Plan issued to plaintiff by Fleming in May 2016. It is unclear from the EEO complaint what plaintiff was alleging at that point. *See* Ex. 5 to Teale Decl. [Dkt. # 14-3] at 1.

claims against my management in . . . (OIIR). Consequently, I am now suffering a hostile and toxic work environment and am now requesting to be immediately reassigned or transferred to another office." Request 2 at 1. As with plaintiff's initial request, she added that "[u]ntil this request is approved, I would like to either telework from home or be placed on paid administrative leave." *Id.*

To support her second request, plaintiff submitted medical documentation, including a December 16, 2016 medical letter from a doctor at George Washington University. *See* Ex. 14 to Teale Decl. [Dkt. # 14-3] at 2. The letter stated that plaintiff "has uncontrolled hypertension that is exacerbated by stress. Her stressful working environment is detrimental to her health causing her to have episodes of hypertensive emergency which may lead to exacerbated health problems of stroke, heart attack, kidney failure, or even death." Letter from Doctor Nicholas Dallas, Ex. 30 to Pl.'s Opp. [Dkt. # 18-32] ("Dallas Letter"). The letter also asked that NASA assist plaintiff "to have her reassigned to a less stressful working environment." *Id.*

In response, NASA informed plaintiff that her doctor was required to submit an additional form in order for her request to be processed. Ex. 14 to Teale Decl. at 2. As of December 30, 2016, plaintiff's doctor had not accessed the form. *Id.* at 1. Plaintiff ultimately faxed the form to her doctor in early January 2017, Carter Dep. at 154:7–9, and the paperwork was submitted to NASA sometime around January 31, 2017. Def.'s SOF ¶ 63; Pl.'s SOF ¶ 63; Carter Dep. at 155:20-156:11. Plaintiff asserts that she was "actively engaged in obtaining the requested medical documentation," and that she submitted other medical documentation to NASA in December 2016. Pl.'s SOF ¶ 63. She also adds that NASA "delayed its follow-up efforts to obtain more detailed information, including a medical evaluation form." *Id.*

## IX.    Plaintiff's October 2016 EEO Complaint

Plaintiff filed a second EEO complaint on October 3, 2016, which reported retaliation "[b]ased on Incident of Harassment and Hostile Work Environment dated September 22, 2016, with DeVon Fleming." Def.'s SOF ¶ 44; Pl.'s SOF ¶ 44; Ex. 7 to Teale Decl. [Dkt. # 14-3] at 1. Plaintiff attached a September 22, 2016 email she sent to her attorney which described a meeting she had with Fleming on the same day, during which Fleming reviewed edits she made to plaintiff's work on different assignments. *See* Ex. 22 to Pl.'s Opp. [Dkt. # 18-24] ("Oct. 2016 Compl.") at 4. Plaintiff recounted "anger in DeVon Fleming [sic] voice and demeanor," *id*., and she reported that after the meeting, her "heart was racing rapidly, and [her] head started to ached [sic]." *Id*. at 5. When asked about this incident in her deposition, plaintiff described Fleming as being "a little rude to me, just – you know, because she was snappy in that meeting. She was a little snappy in the meeting that we had that day[.]" Carter Dep. at 115:22–25. That behavior was the basis of the October 2016 EEO Complaint. Def.'s SOF ¶ 45; Pl.'s SOF ¶ 45.

## X.    Plaintiff's Receipt of a Special Rating, Denial of a WIGI, and Placement on a PIP

On November 29, 2016, plaintiff and Fleming met for plaintiff's mid-point progress review for the 2016-2017 performance period. Def.'s SOF ¶ 47; Pl.'s SOF ¶ 47. One day later, Fleming signed plaintiff's Employee Review. Def.'s SOF ¶ 49; Pl.'s SOF ¶ 49. The narrative section of the review contained an assessment of plaintiff's work, including that she needed improvement in critical element 1 of her performance plan "to meet expectations[,]" along with several recommendations for how plaintiff could accomplish that goal. *See* Ex. 9 to Fleming Decl. [Dkt. # 14-2] at 8.[8]

---

8    Plaintiff disputes that the descriptions of her performance in the review accurately describe her work. Pl.'s SOF ¶ 48.

As a result of the mid-point review procedures, Fleming sent an email to plaintiff on December 13, 2016, summarizing the matters discussed during their meeting and listing assignments plaintiff needed to complete. *See* Ex. 10 to Fleming Decl. [Dkt. # 14-2] at 2–3. After plaintiff responded and noted that some of the tasks covered in Fleming's initial email were "new functions" for plaintiff, *id*. at 1, Fleming replied that "it was not [her] intent to give [plaintiff] new functions during the midpoint[,]" and that plaintiff did not need to perform two of the three new tasks. *See id*. According to Fleming, plaintiff's remaining tasks included: instructions to complete one ongoing task in a more structured fashion, one new item that was critical, and other tasks that plaintiff was already performing. *Id*. Plaintiff contends, however, that "[d]uties that were added to [her] workload in Ms. Fleming's December 13, 2016 [sic] were new duties and increased the complexity of the work performed by Plaintiff, requiring her to shoulder responsibilities that properly should have been performed by [other employees]." Pl.'s SOF ¶ 50.

On January 31, 2017, Fleming issued a "special" unscheduled rating, explaining that plaintiff's work in critical element 1 failed to meet expectations and was rated "unacceptable." Def.'s SOF ¶ 53; Pl.'s SOF ¶ 53. In the narrative of critical element 1, Fleming stated that "Ms. Carter fails to meet expectations in this element. Specifically, she is not managing the overall budget activities to include tracking budget actions through to completion, her budget reports often contain errors, and budget documents are processed with errors and revisions." Ex. 11 to Fleming Decl. [Dkt. # 14-2] at 7. The report then listed several examples of plaintiff's work that had contained errors. *Id*. Plaintiff contends that the rating did not accurately represent her work performance. Pl.'s SOF ¶ 53.

Per NASA policy, if an employee's performance "fails to meet expectations," the employee must be placed on a Performance Improvement Plan ("PIP") and denied a within-grade increase

("WIGI") until the employee's performance improves to "meeting expectations." Def.'s SOF ¶¶ 51–52; Pl.'s SOF ¶¶ 51–52. On February 7, 2017, Fleming initiated the PIP and on February 19, 2017, denied plaintiff's request for a WIGI. Def.'s SOF ¶¶ 53–54; Pl.'s SOF ¶¶ 53–54.

## XI. Plaintiff's Retirement

NASA's Shared Services Center ("NSSC") is charged with handling employee retirements. Def.'s SOF ¶ 56; Pl.'s SOF ¶ 56. On March 9, 2016, before the special rating and the PIP arose, NSSC emailed plaintiff, stating "[w]e understand that you plan to retire on 09/03/2016." Ex. 11 to Teale Decl. [Dkt. # 14-3] at 1. Plaintiff responded on July 19, 2016, by asking for a "revised retirement estimate for my retirement date of 2/3/2017 or 3/3/2017." *Id.* Plaintiff went on to explain: "I am eligible for my next pay increase in February and I will reach my 59 ½ to receive my TSP." *Id.* Plaintiff submits that the email was part of "prudent retirement planning." Pl.'s SOF ¶ 56.

On January 25, 2017, plaintiff communicated with NSSC again about placing her proposed retirement dates – then March 3, 2017 or July 3, 2017 – on hold because she was unsure about the date due to a "Pending Action still not resolved by Agency." Def.'s SOF ¶ 57; Pl.'s SOF ¶ 57; Ex. 12 to Teale Decl. [Dkt. # 14-3] at 1. Part of the pending action was plaintiff's appeal of the desk audit results she received, Def.'s SOF ¶ 58; Pl.'s SOF ¶ 58, and plaintiff claims that another pending action was her second request for reasonable accommodation. Pl.'s SOF ¶ 58. The NSSC responded that it would place the March 3, 2017 retirement date on hold. Def.'s SOF ¶ 59; Pl.'s SOF ¶ 59.

On February 7, 2017, the day that plaintiff was issued a PIP, she submitted her retirement papers, with retirement date of March 3, 2017. Def.'s SOF ¶ 55; Pl.'s SOF ¶ 55.[9]

## XII. Plaintiff's April 2017 EEO Complaint

On April 18, 2017, approximately six weeks after plaintiff retired, she submitted a new EEO complaint to NASA. Def.'s SOF ¶ 64; Pl.'s SOF ¶ 64; Ex. 9 to Teale Decl. [Dkt. # 14-3] ("2017 EEO Compl.") at 1–2. Plaintiff alleged several discriminatory actions by Fleming, including her February 19, 2017 denial of plaintiff's within-grade increase and her negative review of plaintiff in the January 2017 special rating. *See* 2017 EEO Compl. at 1. Plaintiff also alleged constructive discharged based on a hostile working environment due to Fleming's alleged retaliatory behavior against plaintiff for having engaged in a protected activity. *Id*. at 2.

## PROCEDURAL HISTORY

Plaintiff filed the eleven-count complaint in this case on August 27, 2017, alleging violations of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, as well as constructive discharge. Compl. For these alleged wrongs, plaintiff seeks compensatory damages in excess of $300,000, attorneys' fees, and other relief deemed necessary by the Court. Defendant answered on November 6, 2017. Answer [Dkt. # 3].

On March 25, 2019, defendant filed its motion for summary judgment. Def.'s Mot.; Def.'s Mem. Plaintiff opposed the motion, Pl.'s Opp., and defendant replied. Def.'s Reply to Pl.'s Opp. [Dkt. # 20] (Def.'s Reply).

---

9       Plaintiff asserts that her receipt of the PIP was not the sole motivating factor behind her submission of her retirement papers. Pl.'s SOF ¶ 55.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id*. at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id*. at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

### I.     Plaintiff's Failure to Accommodate Claim

Plaintiff alleges that NASA violated the Rehabilitation Act of 1973 when it was "required, but failed, to implement reasonable and effective accommodations for her disabilities." Compl. ¶¶ 62, 64. Specifically, plaintiff claims that defendant "ignored or rejected" the two

accommodation requests at issue, which included requests for telework, transfer, and relocation / reassignment.  Compl. ¶ 65–67.

Defendant moves for judgment on the grounds that it is undisputed that the first accommodation request was properly addressed by NASA when Fleming continued plaintiff on an episodic teleworking plan.  Def.'s Mem. at 10–11.  It maintains that the second request was not administratively exhausted, so is not properly before the Court due to a lack of subject matter jurisdiction, and that it was never finally resolved by NASA because plaintiff retired before her request could be reviewed.  Def.'s Mem. at 12–14.

To establish a *prima facie* case for failure to accommodate, the plaintiff bears the burden of showing "(1) that she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with reasonable accommodation she could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Stewart v. St. Elizabeths Hosp.*, 593 F. Supp. 2d 111, 113 (D.D.C. 2009), *aff'd*, 589 F.3d 1305, 1309 (D.C. Cir. 2010).  If a plaintiff succeeds in establishing a *prima facie* case, the employer must demonstrate that the requested accommodation would have imposed an undue burden on its business; "the ultimate burden, however, remains with the plaintiff." *Faison v. Vance-Cooks*, 896 F. Supp. 2d 37, 49 (D.D.C. 2012), citing *Barth v. Gelb*, 2 F.3d 1180, 1185--86 (D.C. Cir. 1993) (explaining that reasonable accommodation requests should be tested through the application of traditional burdens of proof).

The reasonableness inquiry in step three of the test, requires a determination that a requested accommodation would enable "the employee to fulfill all essential functions of her job," *Graffius v. Shinseki*, 672 F. Supp. 2d 119, 126 (D.D.C. 2009), citing *Woodruff v. Peters*, 482 F.3d 521, 526 (D.C. Cir. 2007), and is "commonly a contextual and fact-specific" one. *Solomon v.*

*Vilsack*, 763 F.3d 1, 9 (D.C. Cir. 2014), citing *Taylor v. Rice*, 451 F.3d 898, 908 (D.C. Cir. 2006). It is well recognized, however, that "'[a]n employer is not required to provide an employee that accommodation [s]he requests or prefers, the employer need only provide some reasonable accommodation.'" *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1305 (D.C. Cir. 1998), quoting *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996). Because it is uncontested that NASA was aware of some of plaintiff's medical conditions, *see* Compl. ¶ 14; Answer ¶ 14, to survive summary judgment in this case, plaintiff must show that she requested an accommodation that would have enabled her to carry out the essential functions of her job, and that NASA failed to provide her with a reasonable accommodation.

### A. There is no dispute of fact concerning whether episodic telework was a reasonable accommodation in response to plaintiff's first request.

Plaintiff takes the position that in response to her first request for accommodation, NASA failed to "engage in any interactive discussions with [her]," failed to provide her with assistance, and that NASA "acted in bad faith regarding the interactive reasonable accommodation process. . . ." Pl.'s Opp. at 36–37. Plaintiff further contends that she never agreed to permanent episodic telework as a reasonable accommodation, and that NASA "callously resisted" her request for a new assignment or transfer. *Id.* at 37.

Defendant submits that the agency's decision to keep plaintiff on an episodic telework plan was a reasonable accommodation as a matter of law because it adequately accommodated her disability and allowed her to perform the essential functions of her job. Def.'s Mem. at 10–12. The agency points to evidence that plaintiff had the same medical conditions for at least ten years before she made her accommodation request, that she had previously been granted episodic telework as an accommodation, and that due to the unpredictable nature of her condition, episodic

telework had been and would continue to be an effective and reasonable accommodation. *Id*. at 9–11.

The law is clear that the "process contemplated" for determining what accommodation is appropriate is a "'flexible give-and-take' between employer and employee," and "'neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability.'" *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014), quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005). "'Thus, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary.'" *Id*., quoting *Sears*, 417 F.3d at 805.

No such failure is present here. Plaintiff told her supervisor that she would take on the responsibility of locating a potential new position, *see* November 10, 2015 Email from Devon Fleming to Kim Carter, Ex. 7 to Fleming Decl. [Dkt. # 14-2] ("[y]ou added that you plan to reach out to an office for a potential reassignment"), and that the agency took steps as well: the Federal Occupational Health Service ("FOH") was asked by the REACT team to provide its assessment of plaintiff's condition and of her request, which it did, *see* Deposition of LaShawn McDuffie, Ex. 13 to Pl.'s Opp. [Dkt. # 18-15] at 33:14–21; 36:2–3; and the REACT team held meetings to assess plaintiff's case, and it did so with information provided by both the plaintiff and other necessary parties. *See, e.g.*, Deposition of Crystal Moten, Ex. 14 to Pl.'s Opp. [Dkt. #18-16] at 43:2–12. Plaintiff has not presented evidence to show that NASA failed to take measures to evaluate her case.

More importantly, plaintiff has not come forward with evidence to create a dispute about whether the accommodation was reasonable. The fact that NASA's choice was not the

accommodation most desired by plaintiff does not create an issue for trial; an employer is not required to grant plaintiff her preferred accommodation, but instead one that reasonably allows her to fulfill the essential functions of her job. *See Aka*, 156 F.3d at 1305. Here, the undisputed evidence establishes that episodic telework was a reasonable accommodation given plaintiff's medical conditions. For example, plaintiff's own testimony confirms that she was previously granted episodic telework and had success using it, *see* Carter Dep. at 38:22–39:6, 40:6–8, and that the onset of her physical medical symptoms would occur unpredictably, *id*. at 39:15–18, making telework opportunities available on an as-needed basis a reasonable response. *Id*. For those reasons, summary judgment will be granted for defendant on plaintiff's claim regarding her first reasonable accommodation request.

### B. The record shows that plaintiff's second accommodation request has not been administratively exhausted.

Defendant contests plaintiff's claim regarding her second accommodation request for two reasons. First, he argues that plaintiff failed to exhaust administrative remedies by not raising the alleged denial of her second reasonable accommodation request in her 2017 EEO Compl. Def.'s Mem. at 13. He also contends that plaintiff abandoned the process of seeking a reasonable accommodation by retiring before the request was ruled upon, so it was not denied. *Id*. at 14.

Under the Rehabilitation Act, when a plaintiff fails to exhaust administrative remedies, it serves as a jurisdictional defect, and the court must dismiss the claim for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See Doak v. Johnson*, 798 F.3d 1096, 1103–04 (D.C. Cir. 2015); *Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006). Exhaustion "serves the important purposes of giving the charged party notice of the claim and narrow[ing] the issues for prompt adjudication and decision." *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (citation and internal quotation marks omitted). Because exhaustion is a jurisdictional

requirement, the plaintiff has the burden to plead and prove it, *see Spinelli*, 446 F.3d at 162, and a plaintiff fails to do so "when the complaint she files in federal court includes a claim that was not raised in the administrative complaint." *Reagan-Diaz v. Sessions*, 246 F. Supp. 3d 325, 345 (D.D.C. 2017), quoting *Latson v. Holder*, 82 F. Supp. 3d 377, 384 (D.D.C. 2015) (internal quotation marks omitted).

Plaintiff's last EEO complaint, filed on April 18, 2017, did not mention the second accommodation request. *See* 2017 EEO Compl. Indeed, plaintiff concedes that "[a]t the time she filed her April 2017 EEO Complaint, NASA had not yet issued a determination or disposition regarding Request 2. So, as of that date, there was no 'adverse action' that could support an EEO complaint." Pl.'s Opp. at 38 n.35. Instead, plaintiff argues that because the EEO Complaint based on her first accommodation request was still outstanding at the time she filed her second EEO complaint, and the second complaint alleged that she was being retaliated against for filing the first EEO complaint, the second request was somehow implicated. *Id*. at 38.

This does not meet the test for exhaustion. As the D.C. Circuit has made clear, "for a charge to be regarded as 'reasonably related' to a filed charge . . . it must [a]t a minimum . . . arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination," as "[t]his connection is necessary to give the agency 'an opportunity to resolve [the] claim administratively before [the employee] file[s] her complaint in district court.'" *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010), quoting *Wiley v. Glassman*, 511 F.3d 151, 160 (D.C. Cir. 2007). Here, plaintiff admits that she did not learn of the disposition of her second accommodation request until discovery began in this litigation, which was after she retired from the agency. Pl.'s Opp. at 38 n.35. And, the second request was not a subject of the April 2017 EEO Complaint. There is no basis to conclude that the agency would have reasonably investigated

plaintiff's second accommodation request as part of her April 2017 EEO Complaint. Since plaintiff failed to exhaust administrative remedies with respect to the second accommodation request, the Court lacks jurisdiction to hear that portion of Count I based on the second request and judgment will be entered in favor of defendant on that as well.[10]

## II.  Plaintiff's unlawful retaliation and discrimination claims

Plaintiff brings a host of claims against defendant based on alleged discrimination and retaliation. Counts II, VI, and IX of the complaint assert claims of unlawful retaliation under the Rehabilitation Act, Title VII, and the ADEA respectively. Counts IV, V, and VIII allege various forms of discrimination under the same statutes. Plaintiff bases these claims on the following alleged adverse actions:  1) wrongful denials of both of her reasonable accommodation requests; 2) Fleming's imposition of new performance standards; 3) Fleming's counseling letter dated January 5, 2016; 4) the denial of the WIGI; 5) the January 31, 2017 unsuccessful performance rating; and 6) plaintiff's placement on a PIP.  Compl. ¶¶ 77, 93, 101, 109, 125, 133.  Plaintiff also adds that exposure to a hostile work environment based on plaintiff's race/color, disability, and age were essential to the retaliation and discrimination she faced.  *Id*.

The Court will analyze plaintiff's discrimination and retaliation claims separately, but a few common, undisputed facts are applicable to both analyses:

- Fleming and plaintiff are both African American women.  Def.'s SOF ¶ 3; Pl.'s SOF ¶ 3.

- Plaintiff had a known disability that manifested in symptoms episodically.  Def.'s SOF ¶ 35; Pl.'s SOF ¶ 35.

- Plaintiff was over the age of 40 at all times relevant to this matter.  *See* Def.'s Mem. at 16 n.5; Compl. ¶ 3.

---

10      Because the Court will grant summary judgment based on defendant's first argument against plaintiff's claim, it does not need to examine his second contention.

- A desk audit performed at plaintiff's requested resulted in a determination that she was performing duties in line with a GS-9 grade level, and not at GS-12 grade level.  Def.'s SOF ¶¶ 6, 8; Pl.'s SOF ¶¶ 6, 8.[11]

- As a result of the desk audit, Fleming had the options of either downgrading plaintiff to a GS-9 level or altering her workload to be consistent with the GS-12 position description.  Def.'s SOF ¶ 9; Pl.'s SOF ¶ 9.

- Fleming updated plaintiff's position description, which included "the same major duties as her prior position description, but sought to add additional clarity as to the scope and substance of those duties."  Fleming Decl. ¶ 9.

### A. Plaintiff has failed to come forward with evidence to show that the explanations for NASA's actions are pretextual.

Under the Rehabilitation Act and Title VII, the federal government may not discriminate against an employee on the basis of race, color, religion, sex, national origin, or disability. 42 U.S.C. § 2000e–16(a); 29 U.S.C. § 701 *et seq.*  Similarly, the ADEA mandates that "[a]ll personnel actions affecting [federal] employees . . . who are at least 40 years of age . . . shall be made free from any discrimination based on age."  29 U.S.C. § 633a(a).  "[T]he two essential elements of a discrimination claim [under the three statutes] are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (collecting cases).  "A plaintiff must prove both elements to sustain a discrimination claim." *Id.*  The Supreme Court has cautioned that federal employee discrimination statutes should not be used as "general civility code[s]" for unhappy employees, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), and courts should not act as "'super-personnel departments that

---

11      Plaintiff's contentions regarding the accuracy of the audit results, as discussed above, are not relevant to this restatement of facts.

reexamine[] an entity's business decisions.'" *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006), quoting *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999).

In cases that do not have direct evidence of discriminatory intent, as is the case here, the arguments are assessed under a three-part burden shifting framework. First, the plaintiff must establish a *prima facie* case of discrimination, as articulated above. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Holcomb*, 433 F.3d at 895. Once a *prima facie* case is established, "[t]he burden [] must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802. If such a reason is provided, the burden shifts back to the plaintiff to prove that the offered reason is pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804; *Holcomb*, 433 F.3d at 901.

But "where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not – *and should not* – decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Office of Sgt. at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). Instead, "the district court must resolve one central question: [h]as the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, [age,] or national origin?" *Id.*; *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) ("[T]o survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason.").

Defendant moves for summary judgment on plaintiff's discrimination claims under several theories. It argues that: 1) plaintiff failed to exhaust her administrative remedies for some claims,

so they cannot be reviewed by this Court; 2) plaintiff has failed to present any evidence of improper motive; 3) several of the challenged actions do not qualify as adverse actions for purposes of discrimination claims; and 4) NASA has asserted legitimate, non-discriminatory reasons for its actions that have not been shown to be pretext. *See* Def.'s Mem. at 15–25. The Court finds that many of the challenged events are not actionable, and that plaintiff has failed to adduce evidence to create a genuine issue as to whether NASA's legitimate explanations for the actions that are adverse are merely a pretext for discrimination.

### 1. Many of the claims fail for lack of an adverse action.

Under *Brady*, the Court ordinarily does not need to determine whether plaintiff has established a *prima facie* case of discrimination "when – as here – defendant contests the existence of an adverse action, the court may consider that issue first." *Francis v. Perez*, 970 F. Supp. 2d 48, 62 (D.D.C. 2013), citing *Baloch*, 550 F.3d at 1196–97 (reviewing challenged adverse employment actions first). Plaintiff lists several negative employment events that she faced while employed at NASA, but not all actions by an employer against an employee are properly considered adverse employment actions for purposes of a discrimination claim, *see Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002), and "not everything that makes an employee unhappy is an actionable adverse action." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001). A plaintiff must show that she faced "adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio*, 306 F.3d at 1131. Tangible harms include "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

Plaintiff identifies the denial of a reasonable accommodation as an adverse action, but the Court has already found as a matter of law that she was not denied a reasonable accommodation in response to her first request, and the second was never adjudicated. The handling of the requests did not affect the terms and conditions of plaintiff's employment and it is not properly considered an adverse event for purposes of plaintiff's discrimination claims.

Second, the refinement of plaintiff's duties or the assignment of new ones in the wake of the desk audit cannot constitute an adverse action. "Changes in assignments or work-related duties do not ordinarily constitute adverse employment actions if 'unaccompanied by a decrease in salary or work hour changes.'" *Lester v. Natsios*, 290 F. Supp. 2d 11, 28 (D.D.C. 2003), quoting *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1556–57 (D.C. Cir. 1997). In this case, changes in plaintiff's work load were implemented *to prevent* plaintiff's pay grade from being lowered, Fleming Decl. ¶ 9, and there is no evidence of any change in her hours. Therefore, even if plaintiff was dissatisfied with the changes, they are not the type of negative employment events that qualify as adverse employment actions.

Third, plaintiff alleges that she was discriminated against by being "counsel[ed] for non-existent performance problems[.]" *See* Compl. ¶ 93. Assuming plaintiff is referring to the January 2016 letter of counseling issued by Fleming, *see* Counseling Letter, such letters are rarely considered adverse employment actions, particularly where they do not result in any financial harms. *See Baloch*, 550 F.3d at 1199 (counseling letter was not an adverse action even under the more permissive standard for an adverse action in a retaliation claim); *see also Hyson v. Architect of the Capitol*, 802 F. Supp. 2d 84, 102 (D.D.C. 2011) (commenting that letters of counseling "will rarely constitute [] adverse action until Title VII"). In this case, the counseling letter listed deficiencies in plaintiff's performance and ways she could improve her work. Counseling Letter

at 1–2.  More importantly, the letter was never added to plaintiff's permanent personnel file and did not trigger any financial repercussions.  Fleming Decl. ¶ 11.  It, therefore, does not qualify as an adverse employment action.

The final alleged adverse actions raised by plaintiff – the "unsuccessful" special rating, the denial of plaintiff's within-grade increase, and imposition of a PIP – must be considered together.  On January 31, 2017, one year after issuing the letter of counseling, Fleming issued plaintiff an unscheduled special rating, which found plaintiff's performance to be "unacceptable."  *See* Ex. 11 to Fleming Decl.  Thereafter, in accordance with NASA policy, Fleming denied plaintiff her anticipated wage increase and placed her on a PIP.  Because the special rating led to the denial of plaintiff's WIGI, which is a financial harm, they are both properly considered to be "adverse consequences affecting the terms, conditions, or privileges of employment. . . ."  *Forkkio*, 306 F.3d at 1131.

On the other hand, placement on a PIP is generally not considered an adverse action in a discrimination claim unless it triggered consequences such as a demotion or loss of pay.  *See Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (placement on a PIP did not constitute an adverse employment action because there was no evidence suggesting that the PIP affected plaintiff's salary or grade).  In this case, placing plaintiff on a PIP was required under NASA policy once Fleming issued the unacceptable rating.  *See* Ex. 12 to Fleming Decl.  [Dkt. # 14-2] at 3 (Section 4.8.1.a).  Denying plaintiff's WIGI was also required.  *Id*. at 3 (Section 4.8.4).  Because issuance of the PIP was mandatory, and it was the rating and not the PIP that delayed plaintiff's wage increase, the PIP itself did not itself result in any tangible consequences, and it is not an adverse action.

### 2.    NASA has provided non-discriminatory reasons.

Having determined which actions qualify as adverse employment actions, the Court next turns to assessing whether the non-discriminatory reasons proffered by defendant for the adverse actions are legitimate, or, as plaintiff argues, pretext for discrimination.

A plaintiff can show that her employer's proffered explanation is pretext for discrimination by providing "evidence sufficient for a jury to find . . . 'that the defendant's explanation is unworthy of credence' and that a jury could 'reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.'" *Primas v. District of Columbia*, 719 F.3d 693, 697 (D.C. Cir. 2013), quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). A plaintiff may point to "changes and inconsistencies in the stated reasons for the adverse action[,]" *Brady*, 520 F.3d at 495 n.3, or "might also establish pretext with evidence that a factual determination underlying an adverse employment action is egregiously wrong[.]" *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015).

Here, plaintiff argues that she must have been the victim of discrimination because she was subjected to the adverse actions while two coworkers who were younger and did not have disabilities were not. She claims that the record "teems with evidence of the pretextual nature of [d]efendant's explanations for the adverse actions taken against plaintiff[.]" Pl.'s Opp. at 44.

But defendant has come forward with evidence to show that the agency's actions were based on legitimate, non-discriminatory reasons:

- Plaintiff's 2015 desk audit, which was not conducted by Fleming, revealed plaintiff was not working at a high enough level. *See* Ex. 1 to Fleming Decl.

- Mr. Condes expressed concern about plaintiff's failure to adequately perform her duties in March 2015. *See* Ex. 18 to Teale Decl.

- Plaintiff was issued a counseling letter in January 2016 that listed her specific deficiencies in in critical element 1 and told her what needed to be improved. *See* Counseling Letter.

- Plaintiff's 2015-2016 performance review contained a note that she was "not performing with the level of detail and understanding required for this position[,]" and plaintiff's November 2016 mid-point review also mentioned her underperformance in critical element 1. *See* Ex. 4 to Fleming Decl. at 7.

- The special rating assessed plaintiff's performance in critical element 1 as "Fails to Meet Expectations." Ex. 11 to Fleming Decl. at 2.

- The PIP noted plaintiff's shortcomings in critical element 1. *See* Ex. 14 to Fleming Decl. at 1.

Each of these assertions was accompanied by a detailed explanation, and the expected improvement was clearly described.

Plaintiff has failed to adduce any evidence beyond her conclusory assertions that any of these explanations was simply a pretext for discrimination. First, while not dispositive, it is worth noting that plaintiff is the same race as Fleming, who issued the special rating and withheld plaintiff's wage increase. Def.'s SOF ¶ 3; Pl.'s SOF ¶ 3. As some other courts in this district have suggested, when a person accused of discriminating against another based on race is of the same race, it may make the claim "suspect." *Hardy v. Marriott Corp.*, 670 F. Supp. 385, 392 (D.D.C. 1987); *accord Watson v. D.C. Water & Sewer Authority*, No. CV 16-2033 (CKK), 2019 WL 6000201, at *13 (D.D.C. Nov. 15, 2018).

Second, the record shows that Patricia Shephard, one of the co-workers plaintiff compared herself to, had different responsibilities than plaintiff but is the same race and approximately the same age as plaintiff, *see* Ex. 2 to Def.'s Reply, Second Decl. of Devon Fleming [Dkt. # 20-2] ¶¶ 3, 5; Supplemental Decl. of Kathleen Teale [Dkt. # 20-1] ¶ 6; Pl.'s Opp. ¶ 55, and the other NASA employee, who is also an African American woman, replaced plaintiff after she retired,

which defendant contends cannot be used as evidence of pretext. Def.'s Reply at 19-20 n.15; *see also* Fleming Dep. at 16, 23–24; Carter Decl. ¶ 61. Plaintiff's conclusory arguments about additional evidence of racial discrimination are, accordingly, contradicted by the record and insufficient to rebut defendant's explanation for the adverse actions.

In her opposition, plaintiff already repeats the litany of employment events she was unhappy with, however, plaintiff has pointed to no facts to create a genuine dispute on the question of defendant's motivation. Accordingly, summary judgment will be granted for defendant on Counts IV, V, and VIII.

**B. Summary judgment will be granted for defendant on plaintiff's retaliation claims because plaintiff has not come forward with facts to show that defendant's stated legitimate reasons were pretextual.**

### 1. Legal Framework

The Rehabilitation Act, Title VII, and the ADEA make it illegal for an employer to retaliate against an employee for engaging in a protected activity, including opposing unlawful employment practices and bringing discrimination charges under any of the three statutes. *See Gomez-Perez v. Potter*, 553 U.S. 474, 479 (2008) (the ADEA); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (Title VII); *Baloch*, 550 F.3d at 1198 (Rehabilitation Act). To prove retaliation in the absence of direct evidence of retaliation, a plaintiff must establish "(1) that [s]he engaged in statutorily protected activity; (2) that [s]he suffered a materially adverse action by [her] employer," *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009); and 3) that her "protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013); *see also Baloch*, 550 F.3d at 1198. As with discrimination claims, once a defendant asserts legitimate, non-retaliatory reasons for its conduct, "the district court should []

proceed[] to the ultimate issue of retaliation *vel non* instead of evaluating whether [plaintiff] made out a prima facie case." *Jones*, 557 F.3d at 678.

### 2. Application

Plaintiff contends that defendant retaliated against her in violation of the Rehabilitation Act (Count II), Title VII (Count VI), and the ADEA (Count IX). She identifies the same adverse actions listed in the discrimination claims as constituting retaliatory acts, along with Fleming's "screaming" at plaintiff in March and May 2015, Fleming's failing to grant plaintiff's requests to telework in 2016, and NASA's "ignoring Plaintiff's physician's dire warning of the life-threatening effects of the abusive OIIR work environment on Plaintiff's health[.]" Pl.'s Opp. at 46 n.41. Plaintiff argues that these actions were in response to the multiple protected activities she engaged in over the course of several years, and their retaliatory nature is supported by the temporal proximity between her participation in those activities and the challenged conduct. *See, e.g.*, Pl.'s Opp. at 21. She submits that a reasonable person working her position would have taken actions as the message: "engage in protected activities and you will be met with the . . . retaliatory measures, that place you in a 'life or death' situation." *Id.* at 47. She asserts that "[a] more chilling message cannot be envisioned." *Id.*

Defendant notes that the alleged screaming incidents cannot be retaliatory events because they pre-dated plaintiff's participation in protected activities. Def.'s Mem. at 22–25; Def.'s Reply at 19. So those will be excluded.

As for the others, the test for whether an employment event is an adverse action for purposes of a retaliation claim is less stringent than the test that applies in a discrimination claim. As plaintiff's opposition recognizes, an "employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006). In this case, however, the Court need not determine whether the alleged adverse events qualify, because summary judgment will be granted based on plaintiff's failure to come forward with evidence to create a genuine dispute with respect to the legitimate, non-retaliatory reasons identified by the defendant.

Defendant has proffered a legitimate, non-retaliatory reason for the challenged actions. He contends that each of the complained-of events flowed directly from the 2015 desk audit. After Fleming adjusted plaintiff's job duties so that she could maintain her grade and pay levels, plaintiff was told repeatedly that she was not performing satisfactorily. *See* Ex. 18 to Teale Decl.; Counseling Letter. There is evidence to show that the "unacceptable" special rating that affected the wage increase came after those problems did not improve. *See* Ex. 11 to Fleming Decl. at 7.

Once defendant came forward with this evidence, it fell to plaintiff to point to facts that would create a question for the jury concerning defendant's true intent, and whether retaliation was the but-for cause of plaintiff's counseling and negative ratings. But plaintiff's response is highly conclusory, and this is the point in the litigation when she is supposed to put meat on the bones of her complaint. Plaintiff objects to defendant's contentions, Pl.'s Opp. at 50, and she says that defendant's proffered explanations fail for the same reasons set out in connection with the discrimination claims.

But the Court has already determined that defendant's legitimate reasons for the adverse actions in plaintiff's discrimination claims are sufficient to overcome plaintiff's allegations; and the same is true here, even with the expanded list of adverse actions. Plaintiff points to no facts to lead one to doubt that following the 2015 desk audit, she continuously failed to meet performance expectations for her position description, was put on notice of her shortcomings and of ways she could improve, and that she still was unable to meet expectations.

Since plaintiff has not pointed to any genuine dispute with respect to those facts, and she does not identify the facts that would lead a jury to conclude those reasons were pretextual, judgment will be granted in favor of defendant.

### III.   Plaintiff's hostile work environment claims

In Counts III, VII, and X, plaintiff asserts hostile work environment claims under the Rehabilitation Act, Title VII, and the ADEA.   Specifically, plaintiff alleges that "beginning in October 2015, Ms. Fleming and Mr. Condes began and continued unabated a pattern of unwelcome harassment, intimidation and ridicule directed at Plaintiff," because she "opposed unlawful employment practices" under the different statutes, and "for participating in protected EEO activities."  Compl. ¶¶ 85, 117, 141.

"Hostile [work] environment claims are different in kind from discrete acts.   Their very nature involves repeated conduct[,]" and may extend over days or years; therefore, "a single act of harassment may not be actionable on its own."   *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).   A plaintiff supports a claim for a hostile work environment when she adduces evidence that shows that "the workplace is permeated with [retaliatory] intimidation, ridicule, and insult" that is "sufficiently severe or pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment."   *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted).   To "determin[e] whether an actionable hostile work environment claim exists, [courts] look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"   *Morgan*, 536 U.S. at 116, quoting *Harris*, 510 U.S. at 23.   That analysis takes into consideration whether the behavior creates "an objectively hostile

or abusive work environment – an environment that a reasonable person would find hostile or abusive" and whether the plaintiff "subjectively perceive[s] the environment to be abusive[.]" *Harris*, 510 U.S. at 21.

In the complaint, plaintiff failed to specify which events constitute her hostile work environment claim. *See generally* Compl. ¶¶ 84–90. In her opposition to the motion for summary judgment, she clarifies that "[b]eginning in 2015, and continuing unabated into early 2017, Plaintiff was subjected to unrelenting abuse and harassment from Fleming[,]" which was "based on Plaintiff's race, gender, disability and her having engaged in protected activities." Pl.'s Opp. at 53–54. Plaintiff argues that the harassment included:

> (1) screaming; (2) abusing NASA's performance management standards and expectations by having myriad duties foisted on [plaintiff] that were not achievable and were unduly harsh; (3) denial of requests to telework; (4) requiring [plaintiff] to be "investigated" by one of the harassers named in her anti-harassment complaint; (5) being issued a Letter of Counseling; (6) denial of [plaintiff's] requests for reasonable accommodation; (7) being issued a WIGI denial in January 2017; and (8) being issued a PIP in February 2017.

*Id.* at 54 n.51. She adds that those events and the "level of animosity directed at Plaintiff" increased after her participation in protected activities and became so extreme that they put her life at risk and affected her ability to do her job.[12] *Id.* at 54.

Defendant offers several reasons why plaintiff's claims fail as a matter of law. For one, defendant argues that plaintiff's claims are based on "an 'array of unrelated' acts separated by significant gaps in time." Def.'s Mem. at 29. They, accordingly, are not sufficient to prove a hostile work environment. *Id.* Defendant also notes that two of the events – the yelling incidents that took place in March and May 2015 – "occurred more than 45 days from [plaintiff's] December

---

12    Plaintiff adds that the hostility also affected her economically by forcing her to retire involuntarily.

2015 EEO contact[,]" and therefore, are not administratively exhausted and "cannot form the basis for a hostile work environment claim." *Id*. Finally, he contends that plaintiff "cannot establish that the conduct identified could possibly be deemed 'hostile' or motivated by any discriminatory or retaliatory animus." *Id*. at 28. For those reasons, he submits that the conduct "fails to rise to the requisite level to support a hostile work environment claim as a matter of law." *Id*. For all those reasons, defendant argues summary judgment should be granted in his favor on plaintiff's hostile work environment claims.

There is no question that plaintiff and Fleming had a difficult relationship that lasted for several years. It is also clear that plaintiff suffered from health issues that were exacerbated by stressful situations. And neither party disputes that as a result of the conduct alleged in the complaint and opposition, plaintiff subjectively felt that her work environment was abusive. *See* Def.'s Reply at 25. However, that is only half of plaintiff's battle. She must still prove that her work environment was so permeated with discriminatory or retaliatory intimidation, ridicule, and insult that a reasonable employee in her position would find it abusive.

As a threshold matter, contrary to defendant's contention, the yelling incidents in March and May 2015 may be included in the list of harassing events. Administrative exhaustion applies equally to hostile work environment claims as it does to discrete discrimination claims. *See Park*, 71 F.3d at 907. As part of that process, a plaintiff is required to contact an EEO counselor "within 45 days of the date of the matter alleged . . . ." 29 C.F.R. § 1614.105(a)(1); *see also Morgan*, 536 U.S. at 122. However, unlike in a discrimination claim, in the hostile work environment context, "[i]t does not matter . . . that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the

filing period, the entire time period of the hostile environment may be considered by a court . . . ." *Morgan*, 536 U.S. at 117.

Here, the parties agree that plaintiff first contacted an EEO counselor on December 21, 2015, more than seven months after the yelling incidents and well outside the statutory time period. *See* Pl.'s Opp. at 19; Def.'s SOF ¶ 13; *see also* April 2016 EEO Compl. at 1. She filed an EEO complaint on April 5, 2016, *see* April 2016 EEO Compl., and it included timely allegations in addition to the yelling incidents. The yelling incidents, therefore, may be considered as allegedly hostile acts.

The incidents the Court must consider, then, are the yelling, the assignment of additional job duties, the supposed denial of the request to telework, the fact that it was Condes who investigated the harassment claim, and plaintiff's receipt of a negative special rating, which led to the denial of a wage increase, and placement on a PIP.

The Court finds that for a number of reasons, the evidence regarding those events does not support plaintiff's hostile work environment claim. With respect to discrimination, plaintiff points to no direct or circumstantial evidence of discriminatory bias based on her race, her age, or her disability. And other than the fact that her negative evaluations piled up at the same time that her EEO action was pending, she does not point to any evidence of retaliatory motive.

Also, there is no evidence that any of the activities was motivated by discriminatory or retaliatory animus. As discussed in the Court's analysis of plaintiff's discrete discrimination and retaliation claims, plaintiff was afforded episodic telework as a reasonable accommodation for her disability, Condes was identified as the proper person to investigate plaintiff's harassment claims pursuant to NASA's internal policies, and plaintiff has not shown that it was anything other than her own failures to adequately carry out her job responsibilities that led to her receipt of the

negative special rating, which in turn automatically triggered the denial of her WIGI and placement on a PIP.

Furthermore, these distinct events are not sufficiently severe or pervasive to constitute a hostile work environment. They are the ordinary tribulations of the workplace, and they took place over two years, in accordance with NASA's policies. These facts counsel against a finding that the conduct was unduly harsh or persistent enough to create a hostile work environment.

Therefore, while the Court is sympathetic to plaintiff's frustration with her working environment and her ongoing medical troubles, it, nonetheless, finds that based on the evidence presented by the parties, a reasonable jury could not find that plaintiff was exposed to a hostile work environment. The Court will, accordingly, grant summary judgment for defendant on Counts III, VII, and X.

## IV.     Plaintiff's constructive discharge claim

Plaintiff's final claim is for constructive discharge, although she fails to identify which statute(s) forms the basis of the allegation. Plaintiff alleges that "Ms. Fleming's abusive and endemic discriminatory and retaliatory conduct and harassment . . . directly and catastrophically adversely affected Plaintiff's health and her ability to perform her job." Compl. ¶ 148. She argues that she

> did not voluntarily retire and was constructively discharged since (1) [d]efendant failed to participate in good faith in the reasonable accommodation process; (2) [d]efendant engaged in unlawful discrimination and retaliation in violation of the VRA, Title VII and the ADEA; (3) there existed conditions that would have prompted a reasonable person to resign; and (4) there are aggravating factors that warrant a constructive discharge finding, including [d]efendant's failure to protect [p]laintiff from direct threats to her health by failing to consider reassignment or transfer.

Pl.'s Opp. at 52. To support her claim, plaintiff directs the Court to a December 16, 2016 letter from Doctor Dallas, her physician at George Washington University Hospital, which plaintiff argues shows that "the OIIR work environment was life threatening." Pl.'s Opp. at 51.[13] She maintains that her "working conditions had become so intolerable that a reasonable employee in her position would have been compelled to resign." *Id.*

Defendant moves for summary judgment on two grounds. He argues that plaintiff's claim fails because the record does not support her hostile work environment claim, which he contends is a requirement for pleading constructive discharge. Def.'s Mem. at 31. He also insists that the evidence shows that plaintiff was not exposed to conditions that were so intolerable that she had no choice but to retire, but instead that she had been planning for her retirement and, in fact, delayed her retirement date, even while the allegedly intolerable events continued. Def.'s Mem. at 30–31.

"[R]esignations or retirements are presumed to be voluntary," *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006) (Rogers, J., concurring) (citation and internal quotation marks omitted), but in certain cases, "the doctrine of constructive discharge enables an employee to overcome the presumption of voluntariness and demonstrate she suffered an adverse employment action by showing the resignation or retirement was, in fact, not voluntary." *Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010). The doctrine is available to a plaintiff whose claim meets an objective test: "whether a reasonable person in the employee's position would have felt compelled to resign under the circumstances." *Id.*

---

13      The letter stated that plaintiff's "stressful working environment is detrimental to her health causing her to have episodes of hypertensive emergency which may lead to exacerbated health problems of stroke, heart attack, kidney failure, or even death." Dallas Letter. It also asked NASA to try to reassign plaintiff. *Id.*

The Court agrees with defendant that because the record does not support plaintiff's hostile work environment claim – or any of plaintiff's claims – her constructive discharge claim fails as well. *See Sewell v. Hugler*, No. 08-5079, 2009 WL 585660, at *1 (D.C. Cir. Feb. 25, 2009) ("To establish constructive discharge claims under Title VII, a plaintiff must show not only that her working environment was hostile, but also that it became so intolerable that her resignation qualified as a fitting response.") (citation and internal quotation marks omitted); *accord Peters v. District of Columbia*, 873 F. Supp. 2d 158, 204 (D.D.C. 2012); *see also McKeithan v. Boarman*, 803 F. Supp. 2d 63, 70 n.5 (D.D.C. 2011) ("[B]ecause [plaintiff] has failed to show that his working environment was hostile, he cannot establish that he was constructively discharged.").

Moreover, while plaintiff maintains that NASA's failure to participate in good faith in the reasonable accommodation process is an aspect of what made the environment so intolerable that she had to resign, the record shows that she retired in the midst of NASA's consideration of her second accommodation request – the one supported by the doctor's letter notifying the agency of the deterioration of her health. And since she retired two weeks after she finally submitted the necessary paperwork, and the agency had not yet responded, and since her retirement had long since been in the works, one cannot find that it was necessitated by the agency's failure to respond to her health concerns. Def.'s SOF ¶ 63; Pl.'s SOF ¶ 63; Carter Dep. at 155:20–156:11.

Based on these facts, a reasonable jury could not find that plaintiff was constructively discharged from NASA, and the Court will grant summary judgment for defendant on Count XI.

## CONCLUSION

For the reasons stated above, the Court will grant defendant's motion for summary judgment. A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: March 31, 2020